UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-20623-CR-LENARD(s)(s)

UNITED STATES OF AMERICA

vs.

**RUBEN RODRIGUEZ** *et al.*,

**Defendant.**
_____/

## CHANGE OF PLEA PROFFER

In *United States v. Ruben Rodriguez et al.*, Case No. 09-20623-CR-LENARD(s)(s), had this case proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt:

**(A)     Evidence of violations of 18 U.S.C. §§ 371 and 1028A**

1. Leading up to November of 2006, Rebecca Garcia ("Garcia"), a then ultrasound technician working in Jackson Memorial Hospital's ("JMH") Abdominal and Vascular Ultrasound Department, had been receiving various medical/cosmetic treatments from Maria Victoria Suarez ("Suarez") at a vascular clinic in Miami. During the course of these treatments, Garcia disclosed the nature of her employment to Suarez.

2. In November of 2006, Suarez informed Garcia that Suarez's husband, Ruben Rodriguez ("Rodriguez"), had a business proposition for her and would like to meet with her. After contemplating the offer for a few weeks, Garcia agreed to a meeting.

1

3. In November of 2006, Garcia met with Rodriguez and Suarez, during which time Rodriguez - in the immediate presence of Suarez - explained the following:

> Rodriguez offered to pay Garcia $1,000 per month to obtain, and provide them with, JMH patient information; Rodriguez specifically requested the names, telephone numbers, addresses, and admitting diagnoses of all patients presenting to the JMH emergency room because of (a) a motor vehicle accident, (b) a "slip and fall" accident, (c) a gunshot wound, or (d) an assault. Upon receipt of this information, Rodriguez, in turn, would pass it on to either of two undisclosed individuals, who then would call the patients. The purpose of all this was to interview the patients, assess their viability for future lawsuits, and ultimately, if appropriate, sign the patients up as clients for a personal injury attorney practicing in Miami-Dade County.
>
> In return for providing the patient information, Rodriguez would be paid by the personal injury attorney. The final payments would represent a percentage of the money eventually earned through subsequent lawsuits/settlements. Rodriguez then would take those funds to pay Garcia and the two undisclosed individuals who contacted and solicited patients.
>
> As far as obtaining/providing the patient information, Garcia would access it daily through JMH's computer system, write it down, and then fax it to a number given by Rodriguez; the facsimile machine was located at Rodriguez and Suarez's residence.

4. Garcia eventually accepted their proposition and thereafter began illegally accessing JMH patient information in December of 2006. She would - on a daily basis - access the information, write it down, and then fax it to a number given to her by Rodriguez, (305) 662-4684; the corresponding facsimile machine was located at Rodriguez and Suarez's residence, 6121 S.W. 28th Street, Miami, Florida 33155 ("Residence"), and the facsimile number was registered with AT&T in Suarez's name. On some occasions, however, she would instead hand-deliver the information to Rodriguez or Suarez at the Residence.

5. Upon receipt of the patient information, Rodriguez or Suarez would fax the information on to undisclosed individuals, who, as referenced above, would contact the JMH patients and assess

2

their viability as a personal injury client.

6. For those JMH patients who became clients of the personal injury attorney through the efforts of Garcia, Rodriguez, Suarez, and others, Rodriguez would receive 35% of whatever ultimately was recovered by the personal injury attorney in relation to them. Once he was paid, Rodriguez would then pay, amongst others, Garcia; these payments to Garcia typically (a) occurred once a month at the Residence and (b) were in cash.

7. On several occasions, however, Suarez paid Garcia. Suarez's payments to Garcia were sometimes in cash and sometimes by check. As to the latter method, on no less than three*** occasions Suarez executed and provided $1,000 checks to Garcia for her monthly services.

8. Ultimately, Rodriguez and Suarez paid Garcia $1,000 a month from December of 2006 to February of 2009. During that time frame, the personal injury attorney wrote 27 checks totaling approximately $85,250 to Pro-Caribbean Enterprises, Inc. ("PCE"), a shell company incorporated on June 14, 2006, by Rodriguez's now-deceased first wife, Natalia Rodriguez ("Natalia"), and used to launder the ill-gotten proceeds.

**(B)     Evidence of violation of 18 U.S.C. § 1503(a)**

9. On June 22, 2006, Natalia and Rodriguez opened up a corporate bank account on behalf of PCE at First Bank of Miami: account number 0230011225. Bank records indicate that at the time the account was opened, both Natalia and Rodriguez were the only listed authorized signers.

10. On July 25, 2007, PCE filed amended articles of incorporation with the State of Florida giving notice that Rodriguez was the new Registered Agent. On this same date, Natalia, who had passed away, was replaced by Suarez as an authorized signer on PCE's corporate bank account.

11. On September 10, 2007, PCE again filed amended articles of incorporation; Rodirguez

3

took over as President.

12. On August 18, 2009, roughly three weeks after Rodriguez was arrested in this matter, PCE filed its "2009 for Profit Corporation Annual Report," which noted that Suarez was the new President, Secretary, Treasurer, Director, and Registered Agent.

13. A subsequent review of deposit slips from PCE's corporate bank account revealed, in part, numerous large checks from various medical clinics and law firms operating in the Southern District of Florida. As a result of this discovery, a grand jury sitting in the Southern District of Florida issued subpoenas to these medical clinics and law firms to determine what, if any, legitimate business relationship existed between them and PCE, Rodriguez, Natalia, and/or Suarez.

14. Upon discovery of the issuance of these subpoenas, Rodriguez approached no less than three owners of medical clinics and/or law firms, and, in an unsolicited manner, gave them forged invoices, instructing them to provide the invoices to the grand jury in response to their subpoena.

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

Date: 12/15/09     By: _____
O. BENTON CURTIS III
ASSISTANT UNITED STATES ATTORNEY

Date: 12/15/09     By: _____
PHIL HOROWITZ
ATTORNEY FOR DEFENDANT

Date: 12/15/09     By: _____
RUBEN RODRIGUEZ
DEFENDANT

4